Affirmed in Part; Reversed and
Rendered in Part; and Memorandum Opinion filed March 31, 2011.

 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NOS. 14-10-00096-CR

          14-10-00097-CR



 

Clifton Earl Polk, II, Appellant

V.

The State of Texas, Appellee

 



On Appeal from the 23rd District
Court

Brazoria County, Texas

Trial Court Cause Nos. 58,086;
57,057



 

MEMORANDUM  OPINION

 

A jury convicted appellant Clifton Earl Polk, II of
arson in cause number 57057 and assessed appellant’s punishment at 25 years’
confinement and a $2,500 fine.  The jury also convicted appellant of criminally
negligent homicide in cause number 58086 and assessed appellant’s punishment at
two years’ confinement and a $10,000 fine.  The trial court ordered the
sentences to be served concurrently.  Appellant contends on appeal that (1) the
evidence is legally insufficient to support his conviction for criminally
negligent homicide; (2) the trial court erred “in the application paragraph of
its charge to the jury on the lesser included offense of criminally negligent
homicide . . . because it did not limit the jury’s consideration to the manner
& means originally set out in the charged offense of murder;” (3) the
evidence is insufficient to corroborate accomplice testimony that appellant
“started the fire in the van and was thereby guilty of the offense of arson;”
and (4) the trial court failed to charge the jury with regard to the offense of
arson “on the law of accomplice witnesses as it applied to Harold Jones, the
State’s main witness, and appellant suffered egregious harm.”

Background

            A group of boys
found a burned-out minivan containing a body in a field near County Road 612 in
Brazoria County at approximately 4 p.m. on March 20, 2006.  An investigation
determined that the body found was that of Mary Ann Harder; that Harder had died
from multiple drug toxicity; and that Harder had accused appellant of sexually
assaulting her a few weeks before her burned body was found in the minivan.  After
a lengthy investigation, the State indicted appellant for arson, murder, and tampering
with evidence.  A jury trial was held from January 4 to January 11, 2010.

            At trial, Jamie
Devercelly testified that a group of boys informed her that there was a burned-out
minivan containing a body near her property in the sparsely populated community
of Holiday Lakes.  Devercelly described the location as a field where “people throw
their garbage and stuff.”  Devercelly called the Sheriff’s Department.

            Peace Officer
Darrell Collins, who worked for the crime scene division of the Brazoria County
Sherriff’s Department, arrived at the scene to investigate the burned-out
minivan.  Officer Collins did not see any containers containing a flammable
substance or a Rubbermaid container when he took pictures and collected
evidence at the crime scene.  Officer Collins and two other officers removed
Harder’s remains from the minivan and arranged for a funeral home to transport
the remains to the Galveston County Medical Examiner’s Office.

            Dr. John DeHaan,
a criminalist who specializes in fire investigations, reconstructed how the
minivan burned.  Dr. DeHaan testified that the fire was started inside the passenger
compartment with gasoline, and that the body was in such a position that it must
have been placed in the minivan; the fire could not have been an accident, and
Harder was not accidentally trapped in the minivan.  The “vehicle was burned
with the body in place.”  Dr. DeHaan opined that the fuel could not have come
from the fuel tank during the fire because the tank was protected. 

Dr. DeHaan testified that the temperature in the van
exceeded 2,000 degrees Fahrenheit; there was no explosion; and the fire was not
extinguished but burned itself out.  Dr. DeHaan concluded that “the fire was
started deliberately within the passenger compartment with the decedent . . . placed
in there prior to the start of the fire, and that there was gasoline present on
the victim at the time the fire was started.”  Dr. DeHaan based these
conclusions on the minivan’s condition — uniform burn patterns; the body’s
position; the presence of the minivan keys in the tailgate lock mechanism; and
the presence of gasoline on Harder’s hair decoration. 

Chief Medical Examiner for Galveston County and
forensic pathologist Dr. Stephen Pustilnik determined the cause and manner of
Harder’s death.  Dr. Pustilnik testified that Harder had no soot in her airways,
which showed that “she did not inhale any sort of hydrocarbon burning, the
products of combustion.”  The toxicology laboratory report established that
Harder had methamphetamine, ecstasy, cocaine, parent cocaine, and cocaine
metabolites in her liver.  According to Dr. Pustilnik, Harder had “a lethal
amount of cocaine in her system, a very large amount of cocaine, not a — what
we see as a recreational amount of cocaine.”

Dr. Pustilnik explained that drugs taken together act
in a synergistic manner so that their effect may be multiplied by a factor of four
or eight.  Although he concluded that Harder died from multiple drug toxicity,
Dr. Pustilnik testified that the cocaine itself could have killed Harder.  He
testified that “there is no safe dosage of cocaine” and “any amount of cocaine
is potentially lethal;” he stated that “cocaine can be lethal at any time to
anyone at any level.”  Dr. Pustilnik could not say whether Harder voluntarily
ingested the drugs that were in her system, and he could not determine the
order in which she ingested the different drugs.  Dr. Pustilnik determined that
cocaine was ingested at or near the time of Harder’s death.

            Harold Jones, a
friend of appellant’s who was present on the evening that Harder died, also
testified during the State’s case-in-chief.  Jones and appellant had become
friends through work in 2002.  He acknowledged using marijuana and cocaine
together with appellant and stated that appellant would usually provide the
cocaine.  Jones testified that he knew Harder because she would “come over” to
get drugs; he stated that he did not know Harder very well and never saw “her
outside of the presence of” appellant.  Jones admitted that he had been charged
with arson but that the State had dropped the charge; he admitted that he was
currently on probation for tampering with evidence and “as part of that
probation” he promised to truthfully testify at appellant’s trial “about what
happened” to Harder.

Jones testified that appellant came to his apartment
on March 19, 2006 because Jones wanted to buy some cocaine from appellant.  Harder
was with appellant when they arrived at Jones’s apartment, although they
arrived in separate vehicles.  Jones knew appellant would be coming over
because he had called; appellant did not mention that Harder would also be
coming over.  

When appellant and Harder arrived at Jones’s
apartment, appellant acted “normal” but Harder “was already kind of stoned.” 
Jones rolled up some marijuana.  After appellant and Jones drank beer and
smoked marijuana for about 30 minutes, they started grinding up the brick of
cocaine appellant had brought.  Jones, Harder, and appellant all were in the
same room when appellant was grinding the cocaine in a coffee grinder to make
it powder.  

Appellant and Jones used some of the cocaine, but
there was still a plate full of cocaine left.  Appellant and Jones were about to
start sacking up the cocaine in Jones’s bedroom when appellant dug into the
plate of cocaine with a large wooden spoon and Jones commented that there was a
lot of cocaine.  Jones testified that Harder then stated, “I’ll swallow it.  And
then she was — just took the spoon from [appellant] and bit down on it and
swallowed the cocaine.”

Jones testified that he and appellant looked at each
other in disbelief “like — you know, like what just happened?”  Jones testified
that he has “never seen nobody [sic] do nothing [sic] like that” and that
Harder was all right at first.  Jones did not know “what’s going to happen” and
thought that Harder “was going to be real, real high.”  

Harder then started shaking, and Jones wanted to call
911.  Appellant took Jones’s home telephone away and said, “[W]e’re not going
to call no one.”  Appellant was holding Harder while she was shaking and
instructed Jones to bring him some milk.  Appellant was holding Harder in his
lap and was trying to make her drink the milk to help break down the cocaine. 
Jones went to another room “praying and everything.”  He then went outside and
walked for more than 100 yards before returning to his apartment.

When Jones returned to his apartment, appellant was
holding Harder and crying; appellant told Jones that Harder was dead.  Jones testified
that he wanted to call 911 but appellant would not let him because “he wasn’t
going back to jail.”  Jones testified that he did not call 911 because he “was
high and everything else” and was “not using best judgments, period.”  Jones
testified that he told appellant to take Harder out of his apartment because he
“just wanted her out of there.”  Appellant was still holding Harder, crying,
and “asking God, don’t let this happen.”  Appellant and Jones were then “just
sitting there trying to figure out what was going to — what was the next move.”

Jones testified that appellant asked him for sheets
and a comforter; appellant laid Harder on the floor and wrapped her in the
sheets.  Jones testified that he did not help appellant and told appellant that
his “hands are off of this.”  Appellant then told Jones that “he was trying to
figure out what he [was] going to do.”  Appellant asked for Jones’s rectangular
plastic Rubbermaid tote so he could put Harder’s body inside.  Appellant placed
Harder’s petite body into the tote and carried the tote to the minivan Harder had
driven to Jones’s apartment.  Jones did not help appellant carry the tote but
followed appellant to the minivan because appellant told him to do so. 
Appellant opened the sliding door and placed the tote in the minivan.  Jones
did not know where appellant intended to take Harder’s body.  

Jones testified that appellant drove Harder’s minivan
and instructed Jones to follow in his Pontiac 6000.  Jones testified that he
felt he had to follow appellant and felt threatened by appellant because
appellant ”had guns” and “had people.”  Jones also testified that appellant
“had made a comment that if I don’t help him — he said, you’re going to help
me.  He was like I know where your mom stay[s].”  Appellant first stopped at a
gas station.  Jones then followed appellant south on Highway 288.  Jones did
not know what appellant had planned; he just followed appellant.  It was dark
outside but Jones did not know what time it was.  

Jones followed appellant on Highway 288 past Pearland. 
Jones was thinking about turning around and driving back to Houston but
appellant called Jones on his cell phone and told him to keep following
appellant.  Telephone records showed that appellant made a one-minute call to
Jones at 11:38 p.m. on March 19, 2006 and four one- to two-minute calls to
Jones on March 20, 2006 between 12:11 a.m. and 12:17 a.m.  Jones did not know
what exit appellant took off Highway 288; Jones could only remember that he
followed appellant down some dirt roads and passed a neighborhood.  Jones
testified that appellant stopped at “a country road with houses down the
street;” appellant “went down this little old hill or something . . . like some
land right there or something” and backed the minivan “up in there.”  Jones
stopped his car about one hundred to two hundred feet away from where appellant
had parked the minivan. 

Jones testified that about five minutes later he “saw
a big boom.  It wasn’t a sound boom.  It was like a — just a flash of light.” 
Jones stated that he heard “[l]ike a whoof . . . when a flame go[es] off like
that.”  Jones also testified that appellant usually carried a lighter with him. 
After Jones saw the flash, he saw appellant running toward Jones’s car. Appellant
got into Jones’s car and gave Jones directions to get back to Highway 288. 
From Highway 288, Jones knew his way home and drove back to his apartment. 
When they arrived at Jones’s apartment, appellant gave Jones a few Xanax pills
to help Jones sleep.  Appellant then drove away in his car; Jones took the
Xanax pills and went to sleep.  The next day, appellant and Jones talked on the
telephone and decided that, if questioned by anyone, they would state that they
had been together “doing music” and “don’t know nothing.”

Approximately one week later, Jones was questioned by
“law enforcement about what had happened.”  Jones was also told by the police
that Harder allegedly had been sexually assaulted, and Jones agreed to provide
a DNA sample.  Jones questioned appellant about the sexual assault, and
appellant admitted to Jones that Harder had filed a complaint against
appellant.  Jones testified that appellant had told him that Harder had filed
the complaint because appellant would not leave his child’s mother to be with
Harder.  

Jones testified that Harder did not seem to be afraid
of appellant.  Jones also testified that appellant did not kill Harder but that
“she OD’d.”  Jones stated that there was no bet and no one dared Harder to take
the cocaine; Harder voluntarily took the spoon from appellant and no one forced
her to take the cocaine.  Jones testified that he did not believe the sexual
assault allegation against appellant because Harder and appellant “were still
hanging out together” even though appellant refused to leave the mother of his
child.

            Larry Calvert
testified that he had met appellant 16 years ago and that his cousin and
appellant had lived together in a house in the McBeth community in 1995; McBeth
is close to the Holiday Lakes community.  After appellant moved from the McBeth
community, Calvert and appellant stayed in contact.  Calvert testified that
appellant called him several times on March 19, 2006, to ask if Calvert had
“any land to where he could take a Cutlass to. Say he had a Cutlass with some
rims and some music in it and he was trying to take it somewhere.”  Appellant
specifically asked if anyone still lived at the place at which appellant and
Calvert’s cousin used to live.  Appellant spoke to Calvert two more times to
ask if Calvert knew of any other place to which appellant could take a car.

Calvert testified that appellant called him three
more times but that he did not answer the phone because he “didn’t want to be
involved in it.”  Calvert testified that he did not want to be involved with
“the car with the rims and the music in it” because “most of the time stuff
like that is like cars getting stripped down.”  

            Brazoria County
Sherriff’s Office Investigator Chris Anderson testified that it would take
about 45 minutes to drive from Houston to the site where the burned-out minivan
was found.  Investigator Anderson ran a license plate check and discovered that
the minivan belonged to Harder’s mother, Alice Harder.  

Investigator Anderson testified that he was contacted
by Harder’s friend, Michael Zolan; after speaking to Zolan, Investigator
Anderson discovered that Harder had filed a sexual assault complaint against
appellant.  Investigator Anderson ordered Harder’s telephone records as well as
appellant’s and Jones’s telephone records.  Based on the records, Investigator
Anderson obtained cell tower information to track the phone calls and the locations
at which the phone calls were made.  Telephone records indicated that appellant
had called Harder on March 19, 2006; the records also showed that appellant had
called Jones six times on March 19, 2006.

Based on the cell phone and cell phone tower records,
Investigator Anderson created maps tracking the time and location of
appellant’s phone calls starting from Jones’s residence to the site where the
burned-out minivan was found; these maps were presented to the jury.  One of the
maps indicates that appellant called Jones at 12:11 a.m. on March 20, 2006, and
both men were close to the site at which the burned-out minivan was found.  The
map also shows that appellant called Jones at 12:15 a.m.; appellant and Jones
were at the same location at the time and close to the site at which the
burned-out minivan was found.

Investigator Anderson also testified that he met with
Calvert on April 17, 2006; Calvert took him to a residence appellant used to
live at off County Road 610 because appellant had inquired if anyone was still
living at this residence or if it was empty.  Investigator Anderson showed the
jury the distance between appellant’s former residence off County Road 610 and
the site at which the burned-out minivan and Harder’s body were found off
County Road 612 on an aerial map; the distance was only “a few miles.”

Investigator Anderson testified that appellant’s
girlfriend Tammy Fuentes provided an alibi for appellant’s whereabouts, but
Fuentes’s story turned out to be untruthful.  He also testified that the phone
records showed that 159 phone calls had been made between appellant and Harder
from March 1 to March 20, 2006; however, no phone calls had been made between
March 12 and March 18, 2006, when appellant called Harder at 3:10 p.m. and had
a 15-minute conversation with her.

After the State rested, appellant made a motion for
directed verdict on the State’s indictments for arson, murder, and tampering
with evidence.  The trial court heard arguments from appellant and the State;
the trial court granted appellant’s motion for directed verdict with respect to
the indictment for murder but denied the motion with respect to arson and
tampering with evidence.  The State requested that the jury charge include
instructions on the lesser included offenses of manslaughter and criminally
negligent homicide.  Appellant objected to the inclusion of instructions in the
jury charge on the lesser included offenses, arguing that there was no evidence
based on which a jury could find him guilty of manslaughter or criminally
negligent homicide.  The trial court overruled appellant’s objection.

The jury returned a verdict finding appellant guilty
of arson; not guilty of tampering with evidence; not guilty of manslaughter;
and guilty of criminally negligent homicide.  The jury assessed appellant’s
punishment at 25 years’ confinement and a $2,500 fine for the offense of
arson.  The jury assessed appellant’s punishment at two years’ confinement and
a $10,000 fine for the offense of criminally negligent homicide. The trial
court ordered the sentences to be served concurrently.  Appellant timely
appealed his convictions for arson and criminally negligent homicide.

 

Analysis

I.                  
Criminally Negligent Homicide

A.        Sufficiency
of the Evidence

In his first issue, appellant argues that the evidence
is legally insufficient to support his conviction for criminally negligent
homicide.

In reviewing a challenge to the sufficiency of the
evidence, we examine all the evidence in the light most favorable to the
verdict and determine whether a rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307, 319 (1979); Brooks v. State, 323 S.W.3d 893,
895, 902 (Tex. Crim. App. 2010) (plurality op.).  This standard gives full play
to the responsibility of the trier of fact to resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts.  Jackson, 443 U.S. at 319; Clayton v. State,
235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  The trier of fact is the sole
judge of the weight and credibility of the evidence.  See Brown v. State,
270 S.W.3d 564, 568 (Tex. Crim. App. 2008).  

When performing a sufficiency review, we may not
re-evaluate the weight and credibility of the evidence and substitute our
judgment for that of the factfinder.  Dewberry v. State, 4 S.W.3d 735,
740 (Tex. Crim. App. 1999).  Instead, we “determine whether the necessary
inferences are reasonable based upon the combined and cumulative force of all
the evidence when viewed in the light most favorable to the verdict.”  Hooper
v. State, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007).  We must presume that
the factfinder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson, 443 U.S. at 326; Clayton,
235 S .W.3d at 778.

In this case, the murder indictment stated that
appellant “did then and there knowingly cause the death of an individual,
namely, Mary Ann Harder, by causing Mary Ann Harder to ingest cocaine” on or
about March 20, 2006.  The trial court granted appellant’s motion for directed
verdict with respect to the murder charge; the trial court instructed the jury
on the lesser included offenses of manslaughter and criminally negligent
homicide.  The jury charge instructed that:

A person commits the offense of Criminally Negligent
Homicide if he causes the death of an individual by criminal negligence. 

*                                  *                                  *


A person acts with criminal negligence, or is criminally
negligent, with respect to circumstances surrounding his conduct or the result
of his conduct when he ought to be aware of a substantial and unjustifiable
risk that the circumstances exist or the result will occur. The risk must be of
such a nature and degree that the failure to perceive it constitutes a gross
deviation from the standard of care that an ordinary person would exercise
under all the circumstances as viewed from the actor’s standpoint.

The charge did not define
“ingest” for the jury.  The application paragraph of the jury charge provided
as follows:

Now bearing in mind the foregoing instructions, if you
believe from the evidence beyond a reasonable doubt, that the defendant,
CLIFTON EARL POLK, II, on or about [the] 20th day of March, 2006, in the County
of Brazoria, State of Texas, did then and there with criminal negligence cause
the death of an individual, namely: Mary Ann Harder, then you will find the defendant
guilty of the lesser offense of CRIMINALLY NEGLIGENT HOMICIDE.

Appellant contends on appeal that the evidence is
legally insufficient to support his conviction for criminally negligent
homicide because there is no evidence in the record that (1) appellant caused
Harder’s death; (2) appellant ought to have been aware there was a substantial
and unjustifiable risk of death from his conduct; and (3) appellant’s failure
to perceive the risk constituted a gross deviation from the standard of care an
ordinary person would exercise.  Appellant argues that the conduct supporting a
conviction for a lesser included offense must be based on the same conduct
charged in the indictment.  Appellant argues that, according to the indictment,
the evidence must show that appellant caused Harder’s death by causing her to
ingest cocaine; there is no evidence that appellant caused Harder to ingest
cocaine because she took it voluntarily; and there is no evidence that
appellant caused Harder’s death.  The jury charge did not track the manner by
which appellant caused Harder’s death as alleged in the indictment.

The Due Process Clause protects an accused against
conviction except upon proof beyond a reasonable doubt of every fact necessary
to constitute the crime with which he is charged.  Hardy v. State, 281
S.W.3d 414, 421 (Tex. Crim. App. 2009) (citing Gollihar v. State, 46
S.W.3d 243 (Tex. Crim. App. 2001)).  Sufficiency of the evidence should be
measured by the elements of the offense as defined by a hypothetically correct
jury charge for the case, not the charge actually given.  Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  Such a charge accurately sets out
the law, is authorized by the indictment, does not unnecessarily restrict the
State’s theories of liability, and adequately describes the particular offense
for which the defendant was tried.  Gollihar, 46 S.W.3d at 253 (citing Malik,
953 S.W.2d at 240).  “The law as ‘authorized by the indictment’ is the
statutory elements ‘as modified by the charging instrument.’”  Geick v. State,
321 S.W.3d 706, 709 (Tex. App.—Houston [14th Dist.] 2011), pet. stricken by
No. PD-1734-10, 2011 WL 303820 (Tex. Crim. App. Jan. 26, 2011) (citing Gollihar,
46 S.W.3d at 255).

We assume without deciding that a hypothetically
correct jury charge in this case need not have tracked the manner and means
language specified in the indictment that appellant caused Harder’s death by
causing her to ingest cocaine.  Given such an assumption and based on the
record before us, we conclude that the evidence is legally insufficient to
support a finding that appellant caused Harder’s death by (1) causing her to
ingest cocaine; (2) preventing Jones from calling 911; or (3) failing to call
911 himself.

No evidence supports a finding that appellant caused
Harder to take the cocaine.  Jones testified that there was no bet and that no
one dared Harder to take a wooden spoonful of cocaine out of appellant’s hand
and swallow it.  He stated that he and appellant were about to start sacking up
the cocaine in Jones’s bedroom when appellant dug into the plate of cocaine
with a large wooden spoon and Jones commented that there was a lot of cocaine. 
Jones testified that Harder then stated, “I’ll swallow it.  And then she was —
just took the spoon from [appellant] and bit down on it and swallowed the
cocaine.”  Jones stated that Harder took the cocaine voluntarily and that no
one forced her to take it.  He also stated that no one expected Harder to do
what she did.

The record does not support a finding that appellant
caused Harder’s death by preventing Jones from calling 911 or by failing to
call 911 himself because there is no evidence that Harder’s life could have been
saved had appellant or Jones called 911.  

Dr. Pustilnik testified that Harder had a
“tremendously high” amount of cocaine in her body.  He stated that Harder had
“a lethal amount of cocaine in her system, a very large amount of cocaine, not
a — what we see as a recreational amount of cocaine.”   Dr. Pustilnik also
stated that the toxicology laboratory report established that Harder had
methamphetamine and ecstasy in her body in addition to cocaine.  He explained
that the drugs taken together act in a synergistic manner so that their effect
may be multiplied by a factor of four or eight.  Although he concluded that
Harder died from multiple drug toxicity, Dr. Pustilnik testified that the
cocaine itself could have killed Harder.  He testified that “there is no safe
dosage of cocaine” and “any amount of cocaine is potentially lethal;” he also stated
that “cocaine can be lethal at any time to anyone at any level.”  

Dr. Pustilnik never stated that Harder’s life was
imperiled by a failure to call 911.  Nor did he opine that Harder’s life could
have been saved had appellant or Jones called for help promptly.  The record
does not contain evidence from which the jury could have determined how much
time passed between Harder’s ingestion of the cocaine and her death; Dr.
Pustilnik opined that Harder ingested the cocaine at or near the time of her
death.  

Jones testified that after Harder had swallowed the
cocaine “at first, she was okay.”  Then Harder started shaking but appellant did
not allow Jones to call 911.  Appellant took Harder from the bedroom to the
bathroom; instructed Jones to bring him a glass of milk; and tried to make
Harder drink the milk.  Jones went to another room “praying” and then went
outside to walk for about 100 yards before returning to his apartment.  Upon
his return, appellant told Jones that Harder was dead and continued holding
Harder and crying.  

Jones’s testimony does not establish how long Harder
lived after ingesting the cocaine.  After he gave appellant a glass of milk and
went “praying,” Jones left his apartment to go for a walk; Harder was dead when
he returned to his apartment.  There is no evidence from which the jury could
have concluded that Harder was alive long enough for paramedics to arrive in
time to save her live or that her life could have been saved at all considering
the “tremendously high” and “lethal” amount of cocaine in Harder’s system after
she voluntarily swallowed a large wooden spoonful of ground cocaine. 

Overton v. State, No. 13-07-00735-CR, 2009 WL
3489844 (Tex. App.—Corpus Christi Oct. 29, 2009, pet. ref’d), is instructive
regarding the evidence necessary to support criminal liability based upon a
failure to obtain medical care.  Overton, who had been trained as an emergency
medical technician, was charged with intentionally or knowingly causing the
death of a child under the age of six years by (1) causing the child to ingest
a substance containing acute toxic levels of sodium; and/or (2) failing to
provide or seek medical care or treatment for the child when Overton had a
statutory or legal duty to act.  Id. at *2.  A jury poll revealed that
the jury’s guilty verdict was based on Overton’s failure to provide or seek
medical care for the child.  Id.  

Overton admitted to giving the child chili mixed with
Zatarain’s chili powder and water mixed with Zatarain’s.  Id. at *16-7. 
The child died from toxic levels of sodium; to reach the level of sodium found
in the child’s body, the child would have had to ingest 23 teaspoons of
Zatarain’s chili powder or six teaspoons of salt.  Id. at *10.  After
ingesting the chili powder, the child had started vomiting around 12:41 p.m.
and was still vomiting at 2:52 p.m.  Id. at *5.  

After the child drank the water and Zatarain’s mixture,
the child stumbled to the ground, started having difficulty breathing, and drifted
in and out of consciousness.  Id. at *11.  Overton called her husband to
come home because the child was “freaking out.”  Id. at *17.  Because
the child complained about being cold, started shaking, and was in shock,
Overton referred to her EMT and nursing books, but did not call 911. Id. 
Overton’s husband came home at approximately 3:45 p.m., and Overton and her
husband decided to give the child a bath to help him warm up.  Id. at
*6, *17.  When the child became “less and less responsive,” Overton and her
husband decided to drive the child to an urgent care center.  Id. at
*18.  The child had stopped breathing by the time they arrived at the center at
5:17 p.m.  Id. at *6.  The nurse at the urgent care center called 911,
and the child was then transported to a hospital.  Id. at *7.  Critical
care specialist Dr. Rotta, who had treated the child at the Children’s
Hospital, opined that the child “could have survived if he had been taken to
the hospital ‘more quickly.’”  Id. at 10.  Evidence established that,
although the child had been “in a traumatic event for an hour and 44 minutes,”
Overton did not call 911.  Id. at *24.

The court of appeals concluded that legally sufficient
evidence supported the jury’s verdict.  Id. at *29.  The court stated
that the jury was free to believe that Overton “knew that medical care was
required, either when [the child] stopped breathing, went into shock, drifted
in and out of consciousness, or suffered a seizure.”  Id. at *27.  The
court also stated that “the jury was free to believe Dr. Rotta’s testimony that
if Overton had acquired medical treatment for [the child] more ‘quickly,’ [the
child] would have survived.”  Id.

The record before us does not contain comparable evidence
from which a rational jury could have concluded that appellant caused Harder’s
death by failing to call 911 or by preventing Jones from doing so after she
swallowed a large wooden spoonful of ground cocaine.  No timeline was
established.  Neither Dr. Pustilnik nor any other witness opined that Harder
could have survived after swallowing a large wooden spoonful of ground cocaine
had paramedics been called.  Dr. Pustilnik opined that Harder died at or near
the time she swallowed the cocaine, and that she had a “lethal,” a
“tremendously high,” and a “very large” amount of cocaine in her system.

Having examined all the evidence in the light most
favorable to the verdict, we cannot conclude that there is sufficient evidence for
a rational jury to find beyond a reasonable doubt that appellant caused
Harder’s death by (1) causing her to ingest cocaine; (2) preventing Jones from
calling 911; or (3) failing to call 911 himself.

Accordingly, we sustain appellant’s first issue.[1]

II.              
Arson

A.               
Sufficiency of Corroboration Evidence

In his third issue, appellant contends that the “evidence
was insufficient to corroborate the accomplice testimony of Harold Jones that
appellant started the fire in the van and was thereby guilty of the offense of
arson.”  The State acknowledged in its brief that Jones “was an accomplice to
this [arson] as a matter of law.”

A conviction cannot be secured upon the testimony of
an accomplice unless corroborated by other evidence tending to connect the
defendant to the offense.  Cocke v. State, 201 S.W.3d 744, 747 (Tex.
Crim. App. 2006).  Article 38.14 of the Code of Criminal Procedure provides
that “A conviction cannot be had upon the testimony of an accomplice unless
corroborated by other evidence tending to connect the defendant with the
offense committed; and the corroboration is not sufficient if it merely shows
the commission of the offense.”  Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon
2005).  In analyzing a challenge to the sufficiency of corroborative evidence,
we view the evidence in the light most favorable to the jury’s verdict.  Brown
v. State, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008).

To evaluate the sufficiency of corroboration evidence,
we must eliminate all of the accomplice testimony from consideration and then
examine the remaining portions of the record to see if there is any evidence
that tends to connect the accused with the commission of the crime.  Castillo
v. State, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007).  The corroborating
evidence need not be sufficient by itself to establish guilt; there need only
be other evidence tending to connect the defendant to the offense.  Id.  Testimony
of an accomplice need be corroborated only as to facts ‘“tending to connect the
defendant with the offense committed and not as to the corpus delicti itself.”’ 
Id.  The non-accomplice evidence does not have to directly link
appellant to the crime, nor does it alone have to establish his guilt beyond a
reasonable doubt.  Id.; McDuff v. State, 939 S.W.2d 607, 613
(Tex. Crim. App. 1997). There must be some non-accomplice evidence which tends
to connect appellant to the commission of the offense alleged in the
indictment. Castillo, 221 S.W.3d at 691.  

Direct or circumstantial non-accomplice evidence is
sufficient corroboration if it shows that rational jurors could have found that
it sufficiently tended to connect the accused to the offense.  Smith v.
State, No. PD-0298-09, 2011 WL 309654, at *14 (Tex. Crim. App. Feb. 2,
2011).  Taken in isolation, suspicious circumstances such as the accused’s
presence at the scene of the crime, motive, or opportunity to commit the crime
are not by themselves sufficient to corroborate the testimony of an accomplice
witness.  Yost v. State, 222 S.W.3d 865, 872 (Tex. App.—Houston [14th
Dist.] 2007, pet. ref’d); see Smith, 2011 WL 309654, at *14;
Brown, 270 S.W.3d at 568.  But cumulative suspicious circumstances may tend
to connect the accused to the charged offense, even if no circumstances are
sufficient to do so individually.  Yost, 222 S.W.3d at 872.  Viewed
collectively, even otherwise insignificant incriminating circumstances may tend
to connect a defendant to a crime he is accused of committing.  Id.  Therefore,
we “consider the combined force of all of the non-accomplice evidence that
tends to connect the accused to the offense.”  Smith, 2011 WL 309654, at
*14.

 Based on the record before us, there was sufficient
corroboration evidence tending to connect appellant to the offense of arson after
eliminating the accomplice witness testimony.

Larry Calvert testified that his cousin and appellant
had lived together in a house in the McBeth community.  He stated that McBeth
is approximately two to three miles from the Holiday Lakes community at which
the burned-out van was found.  Calvert testified and telephone records admitted
into evidence confirmed that appellant had called Calvert several times on
March 19, 2006.  

 

The first telephone call Calvert received from
appellant was at 4:04 p.m., and their conversation lasted about three or four
minutes.  Calvert testified that appellant inquired if Calvert had “any land to
where he could take a Cutlass to. Say he had a Cutlass with some rims and some
music in it and he was trying to take it somewhere.”  Appellant specifically
asked if anyone still lived at the place at which appellant and Calvert’s
cousin used to live; Calvert told appellant that he did not believe anyone
still lived at the place.  Appellant did not ask about any other location.  

            Appellant then
had a four minute conversation with Calvert at 4:12 p.m.; appellant asked
Calvert if he knew “any other place that he could take the car to.”  Appellant
called Calvert again at 7:22 p.m., but Calvert did not answer his phone. 
Appellant called Calvert again at 7:28 p.m. inquiring if Calvert knew of any
other place appellant could take a car to.  Calvert testified that appellant
called him again at 10:02 p.m., 10:11 p.m., and 11:34 p.m. but that he did not
answer the phone because he “didn’t want to be involved in it.”  

  Investigator Anderson testified that, based on the
cell phone and cell phone tower records, he created maps tracking the time and
location of appellant’s phone calls starting from Jones’s residence in Houston
to the site where the burned-out minivan was found in the Holiday Lakes
community.  These maps were presented to the jury, and the jury could see that
appellant made calls to Calvert and Jones while driving to Holiday Lakes late
March 19 and early March 20, 2006.  One of the maps indicated that appellant
called Jones at 12:11 on March 20, 2006, and both men were very close to the
site at which the burned-out minivan was found.  The map also showed that
appellant called Jones at 12:15 a.m.; at that time, appellant and Jones were at
the same location and close to the site at which the burned-out minivan was
found.

Investigator Anderson also testified that he met with
Calvert on April 17, 2006; Calvert took him to a residence appellant used to
live at off County Road 610 because appellant had inquired if anyone was still
living at this residence or if it was empty.  Investigator Anderson showed the
jury the distance between appellant’s former residence off County Road 610 and
the site at which the burned-out minivan were found off County Road 612 on an
aerial map; the distance was only “a few miles.”

Investigator Anderson also testified that appellant’s
girlfriend Tammy Fuentes provided an alibi for appellant’s whereabouts, but
Fuentes’s story turned out to be untruthful.

Appellant contends that there is “not a shred of
corroboration for the fact that Appellant started the fire in the van.”  We
note that the corroborating evidence need not directly link appellant to the
crime, nor does it alone have to establish his guilt beyond a reasonable doubt;
such evidence merely has to tend to connect the appellant to the offense.  Castillo,
221 S.W.3d at 691.  Additionally, “[e]vidence that the defendant was in the
company of the accomplice at or near the time or place of the offense is proper
corroborating evidence.”  McDuff, 939 S.W.2d at 613.

After eliminating Jones’s accomplice witness
testimony from our consideration and conducting an examination of the
non-accomplice evidence, we conclude that the non-accomplice evidence does tend
to connect appellant to the arson sufficiently to corroborate the testimony of
Jones. 

Accordingly, we overrule appellant’s third issue.

B.                
Charge Error

In his fourth issue, appellant argues that the trial
court’s failure to include an accomplice witness instruction in the jury charge
caused him egregious harm.

If a prosecution witness is an accomplice as a matter
of law, the trial court must instruct the jury accordingly.  Herron v. State,
86 S.W.3d 621, 631 (Tex. Crim. App. 2002).  The trial court’s failure to do so
is error.  Id.  The State conceded in its brief that Jones was an
accomplice as a matter of law and that the trial court’s failure to instruct
the jury accordingly constituted error: “Here, Jones . . . was an accomplice to
this offense as a matter of law.  The record shows the trial court failed to
instruct the jury that an accomplice’s testimony must be corroborated by other
evidence tending to connect the defendant to the crime.  The failure to include
that instruction was error.”  (citations to authorities omitted).  

Because appellant did not object to the charge error
he now presents to this court, we must determine whether he was egregiously
harmed by the trial court’s error so that reversal is warranted.  See id.
at 632.  Appellant contends that without the accomplice witness instruction he
was “seriously handicapped in arguing the most crucial fact in the entire case,
Harold Jones’ credibility or lack thereof.”

In considering whether error is harmful, the Court of
Criminal Appeals examines the effect an accomplice witness instruction has on
trial.  Id. at 631.  The purpose of the accomplice witness instruction
is not to cast suspicion on the testimony provided by the accomplice or to
encourage jurors to give it less weight than other testimony.  Cocke,
201 S.W.3d at 747; Herron, 86 S.W.3d at 632.  Rather, the instruction
reminds the jury that it cannot use the accomplice’s testimony to convict the
defendant unless there also exists some non-accomplice testimony tying the
defendant to the offense.  Cocke, 201 S.W.3d at 747; Herron, 86
S.W.3d at 632.  Therefore, “[u]nder the egregious harm standard, the omission
of an accomplice witness instruction is generally harmless unless the
corroborating (non-accomplice) evidence is ‘so unconvincing in fact as to render
the State’s overall case for conviction clearly and significantly less
persuasive.”’  Herron, 86 S.W.3d at 632 (quoting Saunders v. State,
817 S.W.2d 688, 692 (Tex. Crim. App. 1991)).

A defendant may be egregiously harmed when the
corroborating non-accomplice evidence is weak and contradicted by other
evidence.  Id.  “In determining the strength of a particular item of
non-accomplice evidence, we examine (1) its reliability or believability and
(2) the strength of its tendency to connect the defendant to the crime.”  Id. 
The reliability inquiry may be satisfied if there is (1) non-accomplice
evidence; and (2) no rational and articulable basis for disregarding the
non-accomplice evidence or finding that it fails to connect the defendant to
the offense.  Id. at 633.

Appellant concedes in his brief that “the reliability
of the evidence was strong” but complains that “its tendency to connect [him]
with arson was weak.”  Appellant contends that he tried to argue Jones’s lack
of credibility to the jury during closing argument; he also tried to argue that
it was “just as likely that Jones, upon realizing that the evidence left in the
unburned van could be linked to him, returned, removed the evidence and, out of
an abundance of caution, set fire to the van.”  Appellant contends that without
the accomplice witness instruction he was “seriously handicapped in arguing the
most crucial fact in the entire case, Harold Jones’ credibility or lack
thereof.”

Appellant’s closing argument does not support
appellant’s contention that he was “handicapped” in arguing (1) Jones’s
credibility; or (2) that Jones set the van on fire.  Appellant argued repeatedly
that the “evidence more clearly shows Harold Jones came down and retrieved his
DNA-covered stuff so that he would not be associated with it. . . . And as a
drastic measure, he set that van on fire.”  More importantly, the record does
not establish that the corroborating non-accomplice evidence was weak and contradicted
by other evidence.  

As we have outlined in detail above, the corroborating
non-accomplice evidence shows that appellant used to live just two to three
miles from the site at which the burned-out minivan was found.  Calvert
testified that appellant had called him numerous times on March 19, 2006, and
telephone records confirmed the calls.  Appellant first called Calvert at 4:04
p.m. to ask if Calvert knew of any place where he could take a car.  Appellant
in particular inquired if anyone still lived at the place at which appellant
and Calvert’s cousin used to live; and Calvert told appellant that he did not
believe anyone lived there.  Appellant called Calvert just eight minutes later to
ask if there was “any other place that he could take the car to.”  Calvert testified
that appellant again called him at 7:28 p.m. to ask if he knew of any other
place appellant could take a car.  Telephone records also confirm that
appellant called Calvert at 10:02 p.m., 10:11 p.m., and 11:34 p.m.

Investigator Anderson created maps that tracked the
time and location of appellant’s phone calls starting from Jones’s residence in
Houston to Holiday Lakes where the burned-out minivan was found.  The maps
established that appellant made calls to Calvert and Jones while driving to
Holiday Lakes late March 19 and early March 20, 2006.  When appellant called
Jones at 12:11 a.m. on March 20, 2006, both men were very close to the site at
which the burned-out minivan was found; when appellant called Jones at 12:15
a.m., they were at the same location and close to the site at which the minivan
was found.  Investigator Anderson showed the jury the distance between
appellant’s former residence and the site at which the burned-out minivan was found
on an aerial map; the distance was only “a few miles.”  Finally, Investigator
Anderson testified that appellant’s girlfriend provided an alibi for
appellant’s whereabouts, but Fuentes’s story was untruthful.

Based on the record before us, we conclude that the
omission of the accomplice witness instruction was harmless because the
corroborating (non-accomplice) evidence was not “so unconvincing in fact as to
render the State’s overall case for conviction clearly and significantly less
persuasive.”  See Herron, 86 S.W.3d at 632

Accordingly, we overrule appellant’s fourth issue.

Conclusion

We reverse appellant’s conviction for criminally
negligent homicide and render judgment of acquittal in cause number 58086.  We
affirm appellant’s arson conviction in cause number 57057.     

                        








                                                                                    

                                                                        /s/        William
J. Boyce

                                                                                    Justice

 

 

 

Panel consists of Justices Brown,
Boyce, and Jamison.

Do
Not Publish — Tex. R. App. P. 47.2(b).

 









[1]
Having sustained appellant’s first issue, we need not address his second issue
alleging charge error.  See Geick, 321 S.W.3d at 711 n.2.